**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )   **Cause No. 4:21-CR-00155 MTS** |
| **v.** | ) |
| | ) |
| **BRENT M. LAWSON,** | ) |
| | ) |
| **Defendant.** | ) |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

Comes Now Defendant, Brent Lawson, through counsel and respectfully requests this Court follow the Guilty Plea Agreement recommendation and sentence him to ten years in the Bureau of Prisons followed by lifetime supervision. In support of the requested sentence, Defendant submits the following**:**

*The Relevant 3553(a) Factors*

**1.      The nature and circumstances of the offense and the history and characteristics of the defendant.**

Brent Lawson has found himself in a place he never thought he would be again, standing in front of a Judge for sentencing on a child pornography offense. For an individual who has been through this before to end up here again, it leads to so many questions. How could you do this again? Why? What is the Court to do about it? These must be the questions the Court is struggling with.

This case is about addiction as much as it is about pornography. Brent is an addict. Some are addicted to drugs, others alcohol, and some are addicted to pornography. Brent has been addicted to all three, but pornography was the worst. Like any addiction, those who feed that beast will eventually be consumed by it.

In 2019, Brent was struggling in his career and marriage while also dealing with financial trouble.  These stressors caused him to turn to old demons, drugs, alcohol, and porn.  When viewing pornography as an escape Brent found himself going down that slippery slope seeking more risky images and eventually found himself viewing child pornography again.

Viewing child pornography is one of the only criminal offenses one can commit without leaving their house and without interacting with any person.  Many offenders report it is easy to become desensitized to the horrible nature of the images because they are only a few clicks away.  Offenders report viewing the images can be a thrill of the taboo.

None of this is an excuse.  Brent must be punished for his "relapse," but this cycle of addiction provides some context of how Brent found himself back in court.  He fully regrets his decisions and is motivated to address these underlying issues in treatment while in the BOP and in ongoing treatment once he is released.

When the FBI raided his house in November of 2020 it was a life changing moment for Brent.  His prior conviction from 2003 came after he attempted to receive a video tape through the mail at a post office that contained child pornography.  He was interviewed by federal postal inspectors and eventually self-surrendered.  Brent was on pretrial release until sentencing.

This time was different.  Here, the FBI utilized a SWAT team to "kick in" his door and pointed assault rifles at him, his wife, and his young son.  He was confined shortly thereafter and has remained there for over a year.  Most of that time has been spent in Crawford County jail in solitary confinement because they did not have the facilities to house a child pornographer in general population.

Seeing the terror on his son's face when the agents came through the door, seeing the disappointment in his wife's eyes, not being able to see either of them or his parents for the last year due to COVID restrictions at the jail…he knows he failed in a big way.

Despite his failings, Brent can be rehabilitated and is worthy of the chance.  The Court has been provided a letter from Brent expressing his shame and remorse.  *See* Exhibit A, Brent Lawson Letter.  Also provided are character letters from his wife and other family members.  *See* Exhibit B, Character Letters.  His wife has stood by him through this, and his strong family support is a factor to assess his rehabilitative potential.

Prior to his arrest, Brent was a good worker and maintained steady employment.  He has skills that he can utilize to find work after his release and stable employment has never been an issue for him.  Outside of his prior offense and this one, Brent has no other criminal history.  There have never been any accusations of him attempting to contact minors for sexual conduct and there is no evidence he did so.  He has not engaged in more risky behavior like public exposure or other acts that would be a concern.

Brent's real problem is pornography, alcohol, and drugs all of which can be treated.  To address any concerns the Court may have about Brent's pornography addiction the Defense obtained, at Brent's expense, a psychosexual evaluation conducted by Dr. Dean Rosen, a forensic psychologist with many years' experience treating and evaluating sex offenders.  *See* Exhibit C, Dr. Rosen Report. Dr. Rosen conducted a battery of psychological tests used in the field to analyze Brent's thinking, perception, and mental state.  He also conducted a background investigation.  Dr. Rosen found that Brent does not exhibit traits found in "contact offenders" or those who are drawn to children.  Instead, Brent presents as someone who does use pornography as an escape mechanism and that this deviant behavior can be addressed through ongoing psychotherapy and treatment, much like what will be provided to him in BOP and on supervised release.

If the problem is addiction, then treatment is the solution.  But true addiction takes years of treatment and recovery, and this was where Brent really went wrong last time.  After his release from

BOP, Brent was only sentenced to three years of supervised release.  He did well and engaged in the treatment but stopped once he was released.  This was an error.  He should have voluntarily continued in treatment.  In the decade that passed, without continued treatment, Brent let himself fall back into that dark place.  His original term of supervised release was arguably not long enough. The decade in prison he will have to do will give him more treatment, more than he has never gotten.  This will be followed by lifetime supervision which will include continued treatment.

The combination of these two, prison and lifetime supervision, will set him up for success in the future.  Therefore, the only question that remains then, is more than a decade in prison required under these circumstances?  To answer that, we turn to the other 3553(a) factors.

**2.     The need for the sentence imposed to reflect the seriousness of the offense and provide punishment and deterrence, balance against the need for rehabilitation.**

Ten years in the BOP on top of lifetime supervised release will serve as punishment and an enormous deterrence.  A decade in prison is an incredibly long time for anyone.  Brent has an eleven-year-old son. By the time Brent is released, his son will be an adult.  Brent will miss the rest of his son's childhood and some of what should have been his best moments of being a father. The thought of this causes Brent to be full of grief over losing this time with his son.  This is of course his own doing, but that thought alone serves as a punishment for him.  A decade away from his son and other family, that is punishment and deterrence.

As mentioned, although Brent has been through this process before, he did not receive enough treatment. He went through the BOP Sex Offender Program at the time and followed up with some short-term treatment out in the community.  Brent is struggling with multiple addictions and needs more intensive, long-term treatment.  Ten years in the BOP will provide a sufficient, but not greater than necessary, term to give him treatment while he is in custody.

4

Brent will also be supervised for the rest of his life.  Federal sex offender supervision is the most rigorous program an individual can be on.  The officers monitor and ensure compliance.  There are several resources and tactics that will be employed to make sure Brent follows the law.  No computer or monitored computer access, no contact with minors, restrictions of activities, regular polygraphs, and indefinite sex offender treatment are all staples of supervised release.  The combination of all these conditions will be a severe restriction on Brent's liberty and as a measure to ensure compliance.  These conditions help meet the sentencing objectives without the need for more than ten years' incarceration.

Brent has show that when supervised he not only does well, but his performance is always "zero defect."  When on pretrial release in his previous case, Brent had no violations.  In BOP he had no conduct violations.  On supervised release he has no violations.  If in treatment and monitored, he does well.  Prison above the ten-year sentence is not necessary given the evidence he will not fail on supervised release.

Punishment and deterrence must be balanced against the need for rehabilitation.  The severe punishment of ten years in prison and lifetime supervision centered around treatment meets that balance.  The combination of the requested terms of incarceration and supervision meet the 3553(a) factors.

**3.**     **The kinds of sentences available, policies, and the need to avoid unwarranted sentencing disparities.**

 Brent must be sentenced to at least ten years due to the mandatory minimum; however, it is worth noting that the PSR reflects his "pre-mandatory minimum adjustment score" to call for a guideline score lower than ten years.  *See* Doc #40, para. 79, Presentence Investigation Report.  Probation calculates, and the Government agrees, that Brent's total offense level is a 28 with a

criminal history category of II.  Therefore, the guideline imprisonment range is 87 to 108 months. USSG §5G1.1(b) does require that due to the mandatory minimum the guideline score be set at 120 months, but it is worth noting that his score does not exceed what Defense and Government are recommending, and that absent the mandatory minimum, his score would in fact be much lower.

Courts have found that the "parsimony provision" of § 3553(a) which states that a court should impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing is the central relevant policy when sentencing child pornography offenders.  Here, given all that has been presented, a sentence of ten years' incarceration followed by lifetime supervised release with the sex offender conditions, meets that goal.

**4.      The resolution of restitution claims.**

Brent acknowledges that child pornography is not a victimless crime.  He must pay restitution to those whose images he possessed.  However, that restitution must be calculated to account for Brent's actual involvement in the overall harm suffered by the victims and is not to be utilized as a punishment.

The Government is seeking restitution in the amount of $27,000 on behalf of three known victims.  Specifically, they are requesting $12,000 for "April" of the "April Blonde" series; $10,000 for "Violet" of the "At School" series; and $5,000 for "Pia" of the "Sweet White Sugar" series.

18 U.S.C. § 2259 allows for victims of child pornography to submit restitution claims for their incurred damages, and the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, amended 18 U.S.C. § 2259 to set a minimum restitution of $3,000 for each known victim of child pornography.  Victims may seek restitution beyond the $3,000, but they are required to prove why amounts exceeding $3,000 are appropriate.

6

To determine what is appropriate, courts are guided by *United States v. Paroline*, in which the Supreme Court held that the amount of restitution awarded in child pornography cases should "not be severe" nor should it be a "token or nominal amount." 134 S. Ct. 1710, 1727 (2014).  The Supreme Court's analysis was that restitution should be imposed relative to a defendant's "role in the causal process" and that second-hand views of the images are found to be only liable for a fair portion of a victim's losses.  *Id*.

While there is no precise formula for determining restitution under *Paroline*, the Supreme Court has laid out several relevant factors pertaining to a defendant's conduct that a Court should consider.  *Paroline*, 134 S. Ct. at 1728.  Those factors include:

a.   The number of past criminal defendants found to have contributed to the victim's general losses;

b.   Reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's losses;

c.    Any available and reasonably reliable estimate of the broader number of offenders involved (including those who are never caught);

d.   Whether the defendant reproduced or distributed images of the victim;

e.   Whether the defendant had any connections to the initial production of the images;

f.   How many images of the victim the defendant possessed; and

g.   Any other relevant factors to the defendant's causal role.  *Id.*

It appears that the Supreme Court has broken down the relevant factors into two categories.  First, the number of offenders involved in the distribution and possession of the images, and second, the defendant's actions with respect to the images and how many images they possessed.

From the information Defendant has been provided from the Government on behalf of the victims' attorneys, the primary focus of all the restitution requests appears to be on the damages to the child from both the abuse depicted and second-hand views of the images and justification for adding attorney's fees.  Most of the documentation is victim impact material and minimal, if any, information relating to the *Paroline* factors provided.

It is unquestionable that harm was caused to these children by the adults in the videos and by the videos continued re-dissemination on the Internet.  There is no dispute that this harm has a financial cost to these children in terms of needed care.  However, *Paroline* states, in essence, that the fact that an individual is found guilty of a child pornography offense does not give the Government and the victims' attorneys the ability to demand a blank check.  *Paroline*, 134 S. Ct. at 1728.  Some accounting of the *Paroline* factors must be done, and without the required information, the Court is not able to do that accounting.  *Id.*  Presumably the person who molested these children bear a greater responsibility than those who view the images second-hand.

Of the three known victims, only two have attempted to provide some of the relevant data with respect to previous orders and amounts received in other cases, and even that information is lacking.  The attorney for "Violet/At School" has stated that there are 404 current orders for restitution but did not give the amounts. This is the most information any of the victims provided. Yet they demand up to $12,000 from someone who possessed very few of their images. For example, Brent possessed one image from the "Sweet White Sugar" series, and she is demanding $5,000. Brent possessed four images from the "Violet/At School" series and four from the "April Blonde" series, and they are demanding $10,000 and $12,000, respectively.

Given the lack of necessary information, it is unclear how any of the requested amounts were determined.  Without more information on the amount of restitution each victim has received, it makes

it virtually impossible to assess the requested restitution amount using the *Paroline* factors and appears the request is an arbitrary number that fails to account for all the appropriate factors. Arbitrary numbers are exactly what was prohibited under *Paroline. Paroline*, 134 S. Ct. at 1728.

It is also important to note that when assessing Defendant's possession under the "defendant oriented" *Paroline* factors, it appears Defendant had a minimal role, if any, in participating in harm to these victims. There is no evidence he distributed the images of the victims. Defendant had no connection to the original production. The abusers are by far the most responsible for the harm these victims. Next comes people who distributed the images. Lastly are those who simply possess them. The Court should consider these facts when determining restitution.

The Government bears the burden of proving justification for the restitution order sought by preponderance of the evidence. *See United States v. Berk*, 666 F. Supp. 2d 182 (D. Me. 2009); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). They have failed to demonstrate how these amounts can be said to be fairly calculated under these guidelines. The Defense objects to restitution in excess of $3,000 per victim being ordered in this case as the Government or the attorneys for the alleged victims provide the information necessary to a proper calculation under the legal standards. This includes the following: how many restitution orders have been made; how much each order required; and how much restitution each victim has received thus far.

In the past, this court has upheld restitution orders of $3,000 per victim as sufficient in cases where the defendant merely possessed and did not produce or distribute child pornography. *United States v. Beckmann*, 786 F.3d 672, 683 (8th Cir. 2015) (finding $3,000 per victim "an amount consistent with the awards in similar possession cases since *Paroline*"); *United States v. Evans*, 802 F.3d 942, 949-50 (8th Cir. 2015) (finding $3,250 appropriate for the defendant's possession of twenty videos and a few images featuring one victim).

Based on all the reasons articulated above, the $27,000 requested in this case is arbitrary and "severe" and not supported by the *Paroline* factors.  The $27,000 requested would be in violation of the Eighth Amendment's excessive fines clause which is the exact concern the Supreme Court addressed in *Paroline*. 134 S. Ct. at 1726.  This Court should enter an order denying restitution beyond $3,000 as the information supplied by the Government is inadequate to properly determine any restitution amount.[1]

### Other Considerations

Brent's main goal is meaningful and lasting rehabilitation.  To achieve this goal Brent respectfully requests the Court recommend he be placed at FCI Englewood, Colorado.  Englewood offers sex offender treatment, drug treatment, and specialized programming in solar panel repair which interests Brent and he is hoping to take advantage of what they have to offer.

### Conclusion

Based on all the foregoing, Brent respectfully asks the Court to sentence him to ten years in the Bureau of Prisons, followed by lifetime supervised release. The deterrence provided by lifetime supervision, Brent's willingness to continue in therapy and treatment, along with his age and family situation present compelling reasons why the requested sentence is appropriate.  Everyday he spends in prison will be a reminder of time lost with his son.  He only hopes that when he gets out, he can rekindle his relationship with his then twenty-one-year-old son (now eleven), and show he can be a good father, husband, and citizen.  Brent respectfully asks the Court to give him that chance.

---

[1] Given that Brent will be going to prison and must pay restitution, Defense respectfully requests the Court declare Brent indigent, and therefore not subject to the $5,000 special assessment required under 18 U.S.C. § 3013.  Per the statute, the assessment is only appropriate for non-indigent defendants.  Here, Defendant's primary focus needs to be payment of restitution, particularly because he will be unemployed while in prison.

WHEREFORE, for the reasons stated herein, Brent Lawson respectfully asks this Court to sentence him to ten years in the Bureau of Prisons followed by lifetime supervision and grant any further relief the Court deems just or proper.

Respectfully submitted,

FRANK, JUENGEL & RADEFELD,
ATTORNEYS AT LAW, P.C.

By */s/ Joseph W. Flees*
    JOSEPH W. FLEES (#60872MO)
    Co-Counsel for Defendant
    7710 Carondelet Avenue, Suite 350
    Clayton, Missouri 63105
    (314) 725-7777

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

Jillian Anderson
Asst. United States Attorney
111 South Tenth Street, 20th Floor
St. Louis, Missouri, 63102

    */s/ Joseph W. Flees*
    JOSEPH W. FLEES