# DEAN L. ROSEN, Psy.D.
## CLINICAL PSYCHOLOGIST

## Psychological Report

**Name:** Brent Lawson
**Birth Date:** 3/12/1976
**Exam Date:** 8/20/2021
**Exam Procedure:**   Clinical Interview with Brent Lawson
Shipley Institute of Living Scale
Minnesota Multiphasic Personality Inventory 2nd Ed. (MMPI-2)
Wellness Assessment
Adverse Childhood Experience (ACE) Questionnaire
Sexual Violence Risk Assessment (SVR-20)
Review of records:   Bail Report, FBI Report of Examination, Redacted Indictment, National Center for Missing and Exploited Children ECD Technical Assistance Report,

## Referral:

Brent Lawson is a 45-year-old married white male, referred by Joseph Flees, the attorney representing him on federal charges of possession of child sexual abuse material (CSAM).  Mr. Lawson has been aware of an investigation since November 24, 2020, when police came to his home to search for his electronic devices. He was indicted on March 8, 2021, and his been incarcerated since then.  He has been held without bail and is currently held at the Crawford County Justice Center in Steeleville, Missouri under federal jurisdiction. The bail report noted that he had no indication that he would flee but concluded because this was a second offense that the court could not assure that he would appear and did not recommend release under bail. Mr. Lawson had been convicted of ordering an illicit CSAM video tape, allegedly containing child pornography, in a sting operation in 2003.  He served five years in federal prison and about three years of supervised release.  He reports no use of pornography under supervised release.  He reports viewing CSAM between February and November of 2019.  He did participate in individual psychotherapy with me between December of 2020 and February of 2021 before his indictment and pretrial detention.  Psychological and psycho-sexual evaluation is now requested to determine if he can profit from sex offender treatment and to determine if he presents a risk of sexual violence recidivism, to aid the court in sentencing him to current charges.

## Qualifications of the Examiner:

Dean L. Rosen is a clinical psychologist in independent practice, licensed in the state of Missouri since December of 1979. Dean Rosen obtained the Doctor of Psychology degree (PSY.D.) in clinical psychology from the University of Illinois at Champaign/Urbana in January of 1977. Dr. Rosen practices at 745 Craig Road. in St. Louis County, Missouri. Dr. Rosen has been performing psycho-sexual evaluations for the Family Court and for criminal defendants for the past 15 years.  He has testified in both federal court and state criminal court on these assessments. He also has provided treatment to these offenders both pre-sentence and post-sentence as well as training to other professionals on sex offender assessment and sexual addictions.

Brent Lawson Psychological Report                                                                                                 page 2

**Significant Social History:**

    **Education history** indicates graduation in 1994 from Northwest High School in Jefferson County, Missouri.  He obtained an associate degree in 1997 from Jefferson College in Hillsboro, MO, studying design and engineering.  He gives no history of learning problems or use of special education services.  He repeated no grades and reports making average grades in school.  He participated in no school extra-curricular activities.

    **Employment history** indicates he was last employed with CKC Woodwork for 3 years as a project manager until his incarceration.  Previously he worked for 9 years as an engineer with Koken Manufacturing.  He gives no history of termination for cause or quitting jobs without having another job waiting.  He reported some problems getting along with coworkers at Koken, where he felt targeted.  He reports no problems with supervisors on his jobs and no history of disciplinary job write-ups. He reports no complaints of harassment made by coworkers and he has filed no grievances or lawsuits against employers.  He has never filed for personal bankruptcy and was in no significant consumer debt prior to his indictment and incarceration. He has had a part-time self-employment e-commerce site for about 7 years where he sells adult "sex toys", including expensive life-sized dolls used for erotic stimulation or fantasy. His wife has participated in the business and all material was kept locked away in their basement.

    **Medical history** indicates no significant problems other than allergies.  He is a large man and somewhat overweight at 285 pounds on his 6'3" frame.  He reports some weight gain in jail due to the lack of activity while he is under protective custody. He has weighed as much as 320 pounds in 2018 before working out at a gym to lose forty pounds.  He takes Singulair for allergies and no other prescribed medication.  Medical history is negative for seizures, loss of consciousness or head injury.

    **Psychiatric treatment history** is significant chiefly for a prescription of trazadone to aid in sleep in the previous year.  He did participate in psychotherapy for a year in 2003 before his first conviction, seeing a psychologist who specialized in forensic cases, Dr. Bayla Meyer.  He was mandated to participate in structured sex offender treatment while on federal supervised release.  He had a successful experience with the counselor Jenny Toon in St. Louis City, seeing her for 1 ½ years until released from federal supervision around 2012.  He participated in 10 individual psychotherapy sessions with me from December 10, 2020 until February 25, 2021.  I diagnosed him with an adjustment disorder with disturbance of emotions and conduct.  I also diagnosed a dysthymic disorder as he had long-standing problems with self-esteem and self-acceptance which only worsened while he was investigated for child pornography charges.  He expected a lengthy prison sentence as a repeat offender, keeping him from watching his son grow up and leading to much hopeless thinking.

    **Alcohol and drug abuse history** is significant for a pattern of increased drinking to relieve stress.  He was not typically a daily drinker but could drink excessively when he had a bad day to help his mind stop racing.  He could control his drinking socially.  When binging he might drink half of a 750 ml bottle of whisky.  He did not experience many of the common signs in abusive drinking such as DWI charges, missed work or other legal charges such as disorderly conduct.  He did report blackouts, which is seen in more abusive heavy drinking.  He never attended AA or any formal alcohol rehabilitation program. He did admit to weekly marijuana use in the five years before the criminal investigation. Records reviewed for this report indicated he minimized his

**Exhibit C**

substance use pattern in the initial inquiry.  He admitted to some casual use of cocaine in the past.  He reported no use of heroin or amphetamines.  He would mix prescription opiates with alcohol but never felt any opiate dependency.  He gives no history of LSD use or other "party" drugs.

**Childhood and adolescent history** is negative for any pattern of conduct or behavior problems.  History is negative for school suspensions or expulsion, truancy, or in-school detentions for minor infractions. He did get into a few fights in school.  History is negative for stealing, shoplifting, running away, or Juvenile Court involvement.  Childhood history is negative for common precursors to adult anti-social behavior such as diagnosed hyperactivity, bed-wetting, fire-setting or cruelty to animals.

**Adult arrest and conviction history** is negative for any prior offenses other than the 2004 conviction for ordering a child pornography video in a police sting operation.  He served almost five years in federal prisons, with early release to a half-way house program in Farmington. He was seriously injured when attacked at the Springfield, Missouri federal prison after he was suspected of being a child molester. He was then transferred to the federal prison in Seagoville, Texas and served his time without incident. He successfully completed about three years of supervised release.  He gives some history of repeated traffic offenses, but his license has never been suspended or revoked.

**Family background** is not significant for marked disruption or dysfunction.  He grew up with both his natural parents in Jefferson County, Missouri.  He has one brother who is doing okay with his life.  His father is a union machinist and his mother worked as a human resources manager.  He did not experience traumatic losses or disruptions in childhood, but he did lose grandparents and a grandmother while in his 20s.  Childhood history is negative for physical abuse, sexual abuse, or emotional abuse. He witnessed no domestic violence and police were never called to their home.  Child protective services were never involved with his family growing up.  Family history is significant for severe alcoholism in his maternal grandfather. History is significant for depression and anxiety in his mother.  Family history is negative for any criminal behavior.  He described a predictable and stable family atmosphere growing up, with appropriate structure and support. The family was not particularly religious. He described some conflict with his parents as he got older, but he maintains close contact with them, and they have been supportive following his more recent arrest.

**Marital and relationship history** indicates a long-term marriage to Tracey Adams who is five years older than him.  They married in 2003 before his incarceration.  She supported him while he was in prison.  They have one son together who is now 11 years old. This is a first marriage for both and there are no children from any previous relationships.  His son is displaying some signs of anxiety and trauma following the police raiding his home in November of 2020.  The boy is in counseling now.  There has been no domestic violence during his marriage and police were never called to their home.  There have been no marital separations.  He can call his family daily during his pre-trial incarceration but there have been no visits allowed due to restrictions from the COVID 19 pandemic.  He did experience marked frustration in his marriage due to problems with sexual intimacy related to some physical problems in his wife.

**Psycho-Sexual History:**

Exhibit C

Childhood sexual history is essentially unremarkable and typical of individuals arrested for child pornography.  He engaged in no sexual play with peers. Sexuality was not talked about in his family.  He learned about sexuality in school sex education classes in the 9th grade.  His family never discussed it with him or gave him any books to read. His family did not tell sexually tinged jokes in front of the children.  He did discover X-rated video tapes belonging to his father.  His family was appropriately modest and covered up in public spaces at home.  They respected his privacy in the bathroom and bedroom.  He was never the victim of any coerced sexual behavior with adults, family members or youth much older than himself.  His sexual behavior never got him into any trouble growing up.  He reports first masturbating at age 15 or 16, which is a little later than most boys.  He reports always having a sexual interest in women and no same-sex interests or experience.  He had two girlfriends in high school, one lasting about a year.  He was dating his current wife during his senior year, though she is significantly older than him.  He experienced his first sexual intimacy as age 17 and found it exciting.  He engaged in no voyeurism or exhibitionism growing up.  He remembers viewing his father's video tapes by himself when he was in the 8th grade.  He reported no other experience with pornography growing up.

Mr. Lawson reports that his only sexual relationship in adulthood or late puberty was with his wife.  He had no other relationships before his marriage at age 25. He did report significant problems with his body image, always feeling unattractive and undesirable due to his excess weight.  Nevertheless, he did report a couple of other brief encounters with women during his marriage, stating he would meet up, but it would not lead to sex.  He reported no other unusual sexual behavior or interests.  He reported viewing pornography in his 20's but only when no one was home, and about once a week.  He did not participate in erotic chats over the Internet.  He did visit adult "strip clubs" on occasion but not compulsively.  He did not engage with prostitutes and did not patronize erotic massage services.  He engaged in no dominance-submission or bondage roleplays during sexual encounters. He had no fetishes or paraphilia that were necessary for erotic excitement.  He did use sexual "toys" for stimulation with his wife when his wife found sexual intercourse too painful.  He did not report sexual problems in his marriage due to low desire, low frequency, or erectile dysfunction on his part.  He did experience marked sexual frustration in his marriage due to lack of interest by his wife due to painful intercourse.  He did not report any workplace complaints of sexual harassment and reported no same-sex attraction or experience in adulthood.

Mr. Lawson denied sexual attraction to or experience with adolescent girls or boys but admitted to enjoying the excitement of seeing what was forbidden and taboo, which he described as like interest in seeing a car wreck.  He denied attraction or experience with pre-adolescent girls or boys. He did not assume career or volunteer roles that placed him in contact with youth. He described purposefully absenting himself if his son had peers over to the house as he did not want any parent to be suspicious of him if his history became known in their community.  Mr. Lawson reported that his sexual behavior has not caused a problem in his life or was a concern to others, other than his pornography viewing.

Mr. Lawson reported that he believed law enforcement was aware of his side-business selling erotic toys on-line at the time they raided his house for incriminating material.  He knew that his business was a legal business but was aware that it might look unfavorably in criminal prosecution.  He stated that he got into the business of selling realistic adult "dolls" that men used

**Exhibit C**

for erotic stimulation when he approached contacts with importers in 2013. At the time he was looking for some items he could re-sell on-line to make extra income as he had imported computer equipment in the past before he went to prison. They suggested these erotic dolls and he was able to make sufficient income to supplement the family income. He did not think his son was aware of the content of what he sold on-line but that his wife was aware and did not disapprove. He described making $30,000 to $40,000 a year on this business, which was reported to the IRS for taxing purposes.

**Behavioral observations and mental status examination:**

Mr. Lawson cooperated fully in the evaluation. He was brought to the examination room by jail correctional officers and was dressed in prison garb. He appeared well groomed, with short hair and no visible tattoos. He understood the purpose of the evaluation and the limits of confidentiality that I discussed with him before he then read and signed the informed consent form. He understood all questions asked and responded accordingly. He developed an appropriate rapport with the examiner and related in a sincere and open manner. He appeared to be a reliable informant, with the history given consistent with the police reports reviewed. He gave a detailed history of his sexual behavior that appeared reliable because he shared some socially embarrassing behavior. His memory for recent and remote events appeared intact. He displayed no unusual behavior or mannerism in the long assessment session.

During the interview Mr. Lawson's thoughts were logical, consistent and coherent. There was no evidence of loose associations, tangentiality, circumstantiality, push of speech, grandiosity, religiosity, delusions, hallucinations or other psychotic thought process. He did acknowledge much suspicious distrust now. His affect was appropriate to the content of his thoughts. Thought content was negative for suicide or homicide, with no past threats or attempts for either. He reports thoughts of hopelessness and helplessness, stating it feels like his punishment will never end, and he has no control over the outcome. His affect was constricted during much of the interview though he also cried at times. His mood was depressed. He displayed sufficient motivation and stress tolerance to complete the long testing session.

**Symptom Report:**

During the structured interview of common symptoms, his responses were typical of what one would expect when incarcerated with the likelihood of a long prison sentence. He reports both initial and interval insomnia, stating he always had problems falling asleep and staying asleep. His appetite is reduced now but he thought his weight was stable. He stated he had sufficient energy but there was nothing to do in his protective custody other than reading a lot. He reports diminished humor and crying spells. He thought his concentration was adequate when not distracted by the loud noises and screams in the jail. He thought his memory was okay and he enjoyed working on puzzles or word games. He reported "zero" sexual drive or interest. He reported increased irritability but no problems with anger management, stating he becomes quiet and withdrawn when angry. He reported much self-blame currently and no blaming of others. He reported frequent panic symptoms following the initial criminal investigation and general anxiety as well. He will develop physical symptoms in response to stress, reporting headaches and GI symptoms as well as excessive sweating. He acknowledged intrusive thoughts and worries about his criminal prosecution but no marked social withdrawal. He acknowledged having to be

**Exhibit C**

more self-protective while incarcerated.  He could not see himself as possessing much pride in himself currently but acknowledged being a good dad before incarceration but now sees himself as failing at that when locked up.  He did not know how others might see him.  He described marked dysphoria over his body shape and size, always feeling unattractive and undesirable because of his excessive weight.

**Psychological Test Results:**

The **Wellness Assessment** is a brief self-report measure that is administered before the interview.  The first part consists of 11 common symptoms and problems which are rated as bothering the individual "a lot", "somewhat", "a little" or "not at all".  Mr. Lawson reported five symptoms as bothering him a lot, feeling sad, feeling hopeless, feeling no interest in things, trouble sleeping and feeling afraid or fearful.  He checked five items as bothering him somewhat, including nervousness, his heart pounding or racing, feeling everything is an effort, difficulty at home and difficulty socially. He disagreed with statements that he feels good about himself, can deal with his problems, and is able to accomplish the things he wants.  He agreed that he has family and friends that he can count on for help.  He rated his health as fair, checking back pain and asthma as chronic medical conditions.  He checked items indicating he has not felt the need to cut down on his drinking or drug use in the past month and others also expressing no concern regarding his use.  However, he did express feeling bad or guilty about drinking or drug use (presumably in the recent past before incarceration).

These self-reported symptoms and problems appear consistent with his interview remarks and indicate marked emotional discomfort or symptoms and marked dissatisfaction with himself.  Interestingly, he shows much more dysphoria than when he took this self-report measure at the beginning of our psychotherapy together in December of 2020.  At that time, he might have been minimizing his symptoms but shows no such minimization now, since he is locked up and knows he will be convicted.

On the **Adverse Childhood Experience (ACE) Questionnaire** is a ten item self-report measure filled out before the interview.  Mr. Lawson checked none of the 10 items of negative experiences that might have happened to him in his childhood. When individuals check 4 or more adverse experiences on this questionnaire, they have many more problems in adulthood with addictions, physical health, or emotional health. The fact that Mr. Lawson checked none of those ten items would predict no such problems in adulthood or the ability to handle life's problems easier. This would be consistent with the stability in his family that he grew up with and his good achievement and stability as an adult, even after his lengthy imprisonment.

On the **Shipley Institute of Living Scale** Mr. Lawson obtained an estimated IQ score of 102, placing his overall level of current intellectual functioning well within the average range, equivalent to the 55th percentile of adults in his age range.  This score is consistent with his educational attainment.  It indicates sufficient measured intelligence to profit from any psychotherapy or sex offender treatment he might undertake.  The conceptual quotient or CQ score on the Shipley is a statistical comparison of his Vocabulary and Abstraction subtest scores on this measure.  The CQ functions as an impairment index, with scores markedly below 100 (<65) indicative of brain damage, brain disease or the effects of chronic alcohol abuse.  His CQ score of 92 does not suggest any impairment in higher order mental processes from such

**Exhibit C**

conditions though his low mood and anxiety might have contributed to a somewhat lower score than would be expected, given his vocational attainment.

   Mr. Lawson demonstrated sufficient academic attainment and measured intelligence to read and comprehend the items on the MMPI-2 test.  He followed instructions and answered all 566 true-false test items.  The three main validity scales scored for this assessment showed a pattern of marked openness to admitting to unusual experiences or emotional symptoms (F scale at a T score of 67). He was less open in admitting to common human foibles and moral failings (L scate at a T score of 63).  This pattern is seen in more naïve individuals.  There was no attempt to exaggerate emotional problems and he will be more open to admitting to them than most individuals who take this test in forensic settings when they try to present themselves in the best light possible by denying troubling symptoms. Nothing suggests malingering or symptom magnification.  F scale elevations are sometimes seen in acute crisis and can indicate a cry for help.

   Among the ten Basic Scales of the MMPI-2, Mr. Lawson scored in the clinically significant range on seven scales above a T score of 65.  He showed an interesting pattern with scales 1 and 3 significantly higher than scale 2, but all of them above T scores of 90.  This would suggest and individual who is feeling very depressed but tries to smile over it to present a more positive face to the world.  He might focus on physical complaints more than emotional complaints. He can use denial and repression to cope with troubling thoughts and feelings.  When this pattern of adaptation doesn't work for him, then he can be flooded with more disturbing thoughts and feelings.  He also might have more long-standing problems with authority as measured by elevation on scale 4 (T score of 95), though this has not shown up in his adjustment to prison or his stable job history.  Scale 4 elevation can indicate more situational conflicts in which a person is fighting a system or prepared to fight.

   Among the 19 Supplementary Scales of the MMP-2 scored for this evaluation, Mr. Lawson's profile showed elevation in the clinically significant range on seven scales.   His peak elevations were on scales MDS, which assesses marital distress and dissatisfaction, Mt which assesses overall problems in adjustment, and PK and Ps which both measure post-traumatic stress symptoms, consistent with the felt trauma of prosecution and incarceration.  His very low scores on scales Es, Do, and GM would all suggest lack of confidence, difficulty taking action to solve problems, and weak frustration and stress tolerance so that he can become overwhelmed by stressors that others could more easily handle.

   While the MMPI-2 scales were not designed to predict sexual offending, there are some scales that have been seen in more dangerous sexual offenders.  Anti-social individuals can be seen in the sex offender population, with elevations on scales 4 and 9.  Only scale 4 was significantly elevated in his profile, ruling out those markedly anti-social and impulsive traits that put an offender at high risk of repeating his offense or violating the terms of his supervision in the community.  His elevation 8 might suggest more unusual thoughts or more problems in intimate relationships. Little suggested marked violence, consistent with his non-violent history.

   Overall, these interpretations from the clinical literature on the MMPI-2 are consistent with his history and presentation in the interview.  These interpretations, including all quotations, are taken from Friedman, Lewak, Nichols and Webb's *Psychological Assessment with the MMPI-2,* published by Lawrence Erlbaum Associates in 2001.

**Exhibit C**

**Sexual Violence Risk Assessment:**

The SVR-20 is an assessment tool that is frequently used in predicting future risk of sexual violence recidivism.  It is a series of 20 items that have been shown to predict recidivism risk for offenders who have been convicted of contact offenses.  It is filled out by an examiner, using the known history.  It is not a self-report measure.  It does not yield a numerical score and does not yield a statistical risk of re-offending.  Rather, it is a tool that guides an examiner in making an overall assessment of the individual, taking into consideration static features and non-static features, such as recent improvements or deteriorations in functioning.

The 7 items that assess for characteristics of the index offense and sexual offense history are the best predictors of the risk for sexual violence recidivism or re-offending.  None of those 7 items would be scored as present in Mr. Lawson's history and presentation in the interview.  He gives no history of a high density or number of sexually violent offenses, multiple offense types, physical harm to victims, use of weapons or threats of death, escalation in frequency or severity of violent offenses, extreme minimization or denial of offenses, and attitudes that support or condone offenses.  From these items alone, and from what we know about child pornography offenders in general, there is only a very small risk of future violent sexual offending with contact offenses.

The next 11 items are grouped under psychosocial adjustment, with the premise that those whose lives are more unstable are more likely to experience the emotional stress or personality pattern that can lead to sexual violence recidivism.  Mr. Lawson did not score in the positive direction on most of these items.  He did not show a pattern of marked or exclusive sexual deviation; he was not a victim of childhood abuse; he does not show evidence of psychopathy or anti-social personality; he does not have a major chronic mental illness (though he is in marked distress currently and has more long-standing problems with self-esteem): he does not evidence suicidal or homicidal ideation; he has sustained long-term employment and long-term intimate relationships.  He has no history of past non-sexual violent offenses; he has no past history of non-violent offenses other than his prior child pornography conviction, and he has not shown any pattern of supervision failure following his first child pornography offense. He did show evidence of a substance abuse problem and he has had significant depression in the past, seeking and using both psychiatric medication and psychotherapy in the past. Admittedly both his attempts at psychotherapy were following discovery of his sexual offense, suggesting he has more problems seeking help when he is not under threat of prosecution or under supervision.

The third group of items on the SVR-20 deal with future plans and can influence adjustment and offense patterns in the community.  Again, Mr. Lawson did not show evidence of lacking realistic plans following his sentence and does not demonstrate negative attitudes toward intervention, as evidenced by his openness to this evaluation and by his positive experience with psychiatric medication in the past and psychotherapy. Thus, there is little in Mr. Lawson's history, interview, or psychological testing that would indicate he presents any particular risk of violent sexual offending or contact offenses if he is maintained in the community following sentencing or following supervision. The presence or absence of psychopathy or antisocial personality is the best predictor of incarceration for probation failures, and he shows no such tendency. His honesty on the MMPI-2 in admitting to socially undesirable symptoms and beliefs makes his reliability and honesty more likely in his self-reports during the interview.

**Exhibit C**

Case: 4:21-cr-00155-MTS   Doc. #: 49-3   Filed: 03/18/22   Page: 9 of 9 PageID #: 492

Brent Lawson Psychological Report                                                                                               page 9

**Summary and Conclusions:**

    Mr. Lawson is a repeat offender, but his prior offense was in 2003. He did serve a lengthy federal sentence for that offense and managed to rebuild his life, with support from his parents and his wife. It can be difficult to understand such repetition after prior incarceration and relatively successful re-integration into society. While he benefited from sexual offender treatment and prior psychotherapy, he did not reach out and re-enter psychotherapy before acting out in his current offense. He has the ability to form such therapeutic relationships but had difficulty facing the unpleasant and painful feelings he has about himself and his life. His marriage was characterized by much sexual frustration due to a physical problem with his wife, making intercourse painful for her. Under such circumstances he retreated into his second business at home and increased abuse of alcohol and marijuana. His second business selling adult sexual "toys" did not directly contribute to his return to viewing child pornography but it might have contributed to his offense by increasing contacts on-line seeing sexual products and believing that he could avoid detection, creating the perfect storm that contributed to his re-offending.

    Mr. Lawson is now flooded with remorse and grief over losing the family life he created and took such pride in. He accepts responsibility for his offense and is not blaming anyone other than himself. He does find it difficult to live with this remorse and the consequences that follow his actions. There is no indication he ever acted inappropriately with his son or his son's friends. He does not appear to be at risk of engaging in contact offenses. Nothing indicates he was interested in producing or distributing child pornography. He did not try to engage in chat over the internet with others who might share this interest. However, he has more work to do in sexual offender treatment to understand his thinking errors that contributed to his offense and the need to learn to develop better methods to cope with the frustrations in his life.

    Mr. Lawson would benefit from the federal RDAP program in prison, to face the substance abuse patterns he relied on to cope in the past.

    Mr. Lawson should be able to fully participate in and benefit from sexual offender treatment either while incarcerated or post-incarceration. He showed no resistance to such treatment in the past and was able to find benefit in his association with it.

    I believe Mr. Lawson would also benefit from participation in sexual addiction support groups following community supervision. These groups provide fellowship that is ongoing, with participants voluntarily choosing this support. While sex offender treatment follows a group model in Missouri, they prohibit any contact outside the group session. I believe that on-going self-help groups would meet his emotional needs and reduce isolation that contributes to the compulsion to view pornography, whether it is legal or illegal images sought.

                                                                    /s/ Dean Rosen_____
                                                                    **Dean L Rosen, Psy.D.**
                                                                    **Licensed Psychologist (Psy 00844)**

                                                                                        **Exhibit C**